**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

BRIAN HARRISON, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
      Plaintiff,

vs.

SECURIAN FINANCIAL GROUP AND
MINNESOTA LIFE INSURANCE
COMPANY, ITS SUBSIDIARY
      Defendant.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Brian Harrison, individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this Class Action Complaint ("Complaint") against Defendant Securian Fianancial Group and its subsidiary, Minnesota Life Insurance Company ("Minnesota" or "Defendant").

## NATURE OF THE ACTION

1.    This action seeks redress for Plaintiff and hundreds of similarly situated individuals (the "Plaintiff Class") who were harmed by Defendant's recommendation and sale of life insurance policies to be funded through the use of "structured cash flows" sold by Future Income Payments, LLC, f/k/a Pensions, Annuities and Settlements, LLC; and FIP, LLC ("FIP").

2.    Minnesota operates through its duly chosen agents and brokers (collectively "Agents"). Minnesota exercises control over its Agents in the sale, funding and approval of Minnesota insurance products by, including but not limited to, requiring its Agents to:

    a.   follow specific guidelines in the sale of policies;

1

    b.   fill out a Representative's Report;

    c.   advise the purchaser of Minnesota insurance products that the Agent is acting on behalf of Minnesota;

    d.   solicit and procure applications for insurance for Minnesota;

    e.   remit all applications and premiums to Minnesota;

    f.   service Minnesota policy holders; and

    g.   conduct themselves with the highest principles of honesty, integrity, and pride.

3.     As the principal for its Agents, Minnesota is directly answerable for its Agents' actions.

4.     Minnesota's Agents provided insurance and/or retirement planning advice to members of the Plaintiff Class.  As Agents of Minnesota, Minnesota's Agents' retirement and/or insurance planning advice involved the sale of Minnesota insurance products.

5.     With respect to the members of the Plaintiff Class, Minnesota Agents recommended that they purchase universal life insurance policies that would be funded at a target level (e.g., $250,000). When fully funded, Minnesota Agents indicated that those policies would provide a death benefit and would have an accumulated value that would allow policyholders to supplement their retirement income by borrowing against the policy.

6.     Minnesota and its Agents further advised members of the Proposed Class that they should implement this strategy (the "Life Insurance Retirement Strategy") by using structured cash flows acquired through FIP.

7.     This strategy involved a procedure whereby policyholders would pay a lump sum to FIP to purchase a monthly income stream that represented the total amount paid to FIP plus a pre-determined rate of return, which depended on the term of the structured cash flow. For

example, a policyholder might pay FIP $100,000 to acquire a monthly income stream for a period of 3 years at a 5% rate of return. FIP paid higher returns for cash flows with longer terms.

8. Pursuant to the Life Insurance Retirement Strategy, those payments received from FIP would be directed to Minnesota to pay for Minnesota's life insurance policy. Minnesota and its Agents recommended that members of the Plaintiff Class use FIP income streams to pay their life insurance premiums, as the rate of return that they received on the FIP product would allow them to fund their Minnesota life insurance policies at a higher target amount than they otherwise could by utilizing other options (i.e., a money market account or CD) for the same purpose.

9. Minnesota's Agents indicated to class members that the Agents "represent Minnesota Life with respect to the sale and service of" the Minnesota policies, including in disclosing the source of funding to Minnesota and explaining to class members all pertinent details of the strategy, suitability and other facets of the Life Insurance Retirement Strategy.

10. Upon information and belief, both Minnesota and FIP gave Minnesota's Agents commissions or "referral fees" of 5% or higher on its sale of FIP cash flows to members of the Plaintiff Class and a greater amount in commission for the sale of the Minnesota policy.

11. On information and belief, the information provided by Minnesota Agents on the applications for Minnesota policies submitted on behalf of the members of the Plaintiff Class incorrectly characterized the source of funds for these policies and failed to disclose that payment of the the policy premiums depended on the viability of the FIP cash flow product.

12. For its part, FIP funded the cash flows it sold to members of the Plaintiff Class by "purchasing" future income from individual pensioners, including retired teachers, police officers, and military personnel. FIP offered pensioners up-front, lump-sum payments in exchange for receiving a portion of their monthly pension payments over a specific term, often three to five

years. FIP would purchase these pension payments at a "discount," such that the total of the monthly payments made by the individual pensioners to FIP far exceeded the amount of the lump-sum he or she received, amounting to an effective interest rate of more than 100% in some cases.

13.     Even though FIP characterized these transactions with pensioners as "purchases," numerous state and federal regulators have investigated and determined that the deals were, in fact, loans. Those loans were unlawful transactions, as they were made by an unlicensed lender (FIP) at effective interest rates that violated state usury laws, without legally mandated disclosures. These regulatory actions resulted in numerous orders requiring FIP to cease and desist its pension advance operations in various states and municipalities.

14.     As a result of this mounting regulatory pressure, FIP ceased collecting payments from pensioners or making payments to income stream purchasers in or about April 2018.

15.     The loss of the monthly income streams that members of the Plaintiff Class purchased from FIP has been devastating. Those payments represented the only way that purchasers could recoup the funds used to execute the Life Insurance Retirement Strategy and were essential to funding their Minnesota life insurance policies and avoiding lapse, surrender charges, or other penalties.

16.     As such, the members of the Plaintiff Class, relying upon Minnesota's Agents' advice, expected that the FIP income streams they purchased would be safe and secure. Minnesota and its Agents, as the architects of the Life Insurance Retirement Strategy, also clearly understood that the funds its customers dedicated to fund their life insurance needed to be protected and could not be subject to unreasonable risk of loss.

17.     In spite of this, Minnesota and its Agents recommended the FIP funding strategy to its customers without doing adequate due diligence and in negligent disregard of the numerous

4

risks associated with the FIP cash flow transactions. As the regulatory actions against FIP make clear, the FIP cash flow product was inherently flawed and subject to serious risks that should have prevented Minnesota and its Agents from recommending that members of the Plaintiff class use it to fund their life insurance policies.

18.     Minnesota and its Agents either knew or should have known that the FIP product was not safe enough to justify using it as part of the Life Insurance Retirement Strategy. In addition to the issues raised in the various regulatory actions, numerous other risks made these FIP transactions wholly inappropriate for use in the Life Insurance Retirement Strategy. Minnesota and its Agents violated its duties to the members of the Plaintiff Class by recommending that they use FIP cash flows to fund their Minnesota life insurance policies.

## THE PARTIES

19.     Plaintiff Brian Harrison is a citizen and resident of North Ridgeville, Ohio.  In or about February 2016, Plaintiff was advised by an Agent to utilize the Life Insurance Retirement Strategy.

20.     Upon information and belief and during the time of the actions described herein, Defendant Securian Financial Group and its subsidiary, Minnesota, was a Minnesota corporation with its principal place of business in Minnesota.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than a Defendant.

22.     This Court has personal jurisdiction over Minnesota because Minnesota, among other things, marketed and sold insurance products in Ohio as well as hired Agents in Ohio to sell its products.

23.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2), as many of the acts complained of herein took place within and from this district. Defendants do business in this judicial district and have received and continue to receive substantial revenue and profits from their conduct in this judicial district. Plaintiff resides in this judicial district. and Plaintiff's causes of action arose in this district.

## FACTUAL BACKGROUND

### Minnesota and the Life Insurance Retirement Strategy

24.     Minnesota markets its products to consumers through its Agents.  Minnesota knows that its Agents provide financial advice, insurance, and retirement planning services.

25.     The members of the Plaintiff Class all sought financial advice or retirement-planning services from Minnesota and its Agents.

26.     Minnesota and its Agents recommended that Plaintiff and the members of the Plaintiff Class implement the Life Insurance Retirement Strategy. As noted above, that strategy centered on the purchase of a Minnesota universal life insurance policy.

27.     Minnesota's Agents universally indicated to class members that the Agents "represent Minnesota Life with respect to the sale and service of this product," including in disclosing the source of funding to Minnesota and explaining to class members all pertinent details of the strategy, suitability and other facets of the Life Insurance Retirement Strategy.

28.     In a universal life policy, any premium payments above the cost of insurance (the cost of the policy's death benefit) are directed into an internal investment account by the insurance

company. The value of that investment account is referred to the accumulated value or "cash" value of the policy.

29.     According to the Life Insurance Retirement Strategy recommended by Minnesota and its Agents, policyholders would make premium payments sufficient to raise the cash value of their policies to a target level, based on their available assets and retirement income needs. When fully funded, the cash value of these policies would be available for policyholders to access by taking out tax-free loans.

30.     Policyholders would not have to pay back those loans during their lifetime, as the amount of the loans is limited to the policy's cash value, and the insurance company uses the death benefit to pay off any accrued interest. Thus, these loans would act as a supplement to the policyholder's retirement income.

31.     Another feature of the Life Insurance Retirement Strategy recommended by Minnesota and its Agents was the mechanism that Minnesota and its Agents advised members of the Plaintiff Class to use to fund their life insurance policies. Minnesota and its Agents recommended that members of the Plaintiff Class use "structured cash flows" sold by FIP income streams to pay their life insurance premiums.

32.     Policyholders would pay a lump sum to FIP to purchase a monthly income stream for a set period of time. The total of those monthly payments would equal the amount paid to FIP plus a pre-determined rate of return, which increased with the length of the term the policyholder chose.

33.     For example, a policyholder might select a monthly income stream for a period of 3 years at a 5% rate of return or choose a 10-year term at an 8% rate. Policyholders would direct

the monthly payments they received through this FIP income stream to fund their Minnesota life insurance policies.

34.     Minnesota and its Agents advised members of the Plaintiff Class that the FIP funding method was preferable because the rate of return on the FIP product would allow them to fund their Minnesota life insurance policies at higher amounts than they could by paying periodically out of a checking account or similar vehicle. For example, a policyholder using this strategy could, in theory, fund a policy to the target level of $400,000 over five years for an initial lump-sum payment to FIP of around $340,000.

35.     On information and belief, the information provided by Minnesota Agents on the applications for Minnesota policies submitted on behalf of the members of the Plaintiff Class incorrectly characterized the source of funds for these policies and failed to disclose that payment of the the policy premiums depended on the viability of the FIP cash flow product.

36.     On information and belief, Minnesota and its Agents knew that the class members' policies would not have been issued had the Agents properly disclosed that FIP cash flows were being utilized as the source of funding the policy premiums.

### The FIP Income Stream Funding Mechanism

37.     Pensions, Annuities, and Settlements, LLC ("PAS"), is a Delaware limited liability company formed in 2011 and located in Henderson, Nevada.  Scott Kohn, a resident of Nevada, is the sole and founding member of PAS, and its president, secretary, and treasurer.

38.     In 2014, PAS amended its certificate of formation to change its name to Future Income Payments, LLC.

39.     FIP LLC is a Nevada limited liability company formed in 2016 and located in Henderson, Nevada.  Cash Flow Outsourcing Services, Incorporated, a corporation based in the Philippines and solely owned by Kohn, is the sole and managing member of FIP LLC.

40.     The entities operating as Pensions, Annuities and Settlements, LLC, Future Income Payments, LLC, or FIP, LLC are collectively referred to herein as "FIP." All available information indicates that Scott Kohn was the sole owner and manager of FIP at all times pertinent to this Complaint.

41.     Scott Kohn pleaded guilty in 2006 to three federal felony offenses related to trafficking in counterfeit goods, and he was sentenced to fifteen months in federal prison.  More specifically, Kohn pleaded guilty to directing employees of a company he owned to replace branded computer memory modules with counterfeit memory chips and then to sell them fraudulently as though they were genuinely branded computer memory modules.  He also hired other companies to encode generic computer hard drives with software to make them appear (falsely) to be branded hard drives and directed employees to sell them as though they were genuinely branded drives.

42.     FIP funded the cash flows it sold to members of the Plaintiff Class by "purchasing" future income from individual pensioners, including retired teachers, police officers, and military personnel. FIP offered pensioners up-front, lump-sum payments in exchange for receiving a portion of their monthly pension payments over a specific term, often three to five years.

43.     FIP marketed its product to pensioners as a "pension advance" or "pension buyout," whereby FIP would pay a lump sum to "purchase" a "future income stream" from a pensioner.

44.     FIP's agreement with pensioners provided that the pensioner would receive a one-time lump sum in exchange for a specified amount of the pensioner's monthly pension for a

specified period of months. As part of this arrangement, pensioners would instruct the bank into which their pension payments were received to transfer that specified amount to FIP, and pensioners often executed authorizations for electronic funds transfers allowing FIP to collect the pension installment payments from pensioners' accounts.

45.     The pension-advance industry has long been the subject of scrutiny with respect to the business practices prevalent among its companies. As the Consumer Fraud Protection Bureau noted in a recent court filing, "[i]n the past few years, the income stream market has come under sharp scrutiny for allegedly marketing loans at undisclosed, exorbitant interest rates to vulnerable populations, including veterans and the elderly." *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1130 (D.C. Cir. 2017). For example, in 2014, the United States Government Accountability Office did a thorough investigation of the industry and issued a report (GAO 14-420) concluding that "pension advance companies market their products as a quick and easy financial option that retirees may turn to when in financial distress from unexpected costly emergencies or when in need of immediate cash for other purposes," but, in fact,  pension advances may come at a price that may not be well understood by retirees . . . [and] the lack of transparency and disclosure about the terms and conditions of these transactions, and the questionable practices of some pension advance companies, could limit consumer knowledge in making informed decisions." The GAO report also recommended that the CFPB and FTC conduct formal reviews to determine whether the pension-advance companies such as FIP violated consumer laws or engaged in unfair trade practices.

46.     As concerns about pension advance transactions grew, numerous state regulators initiated enforcement actions against FIP, alleging that its pension income purchases were, in fact, unlawful loans.

10

47.     Even though FIP characterized its pension transactions as "sales" or "purchases," the transactions lacked certain fundamental characteristics of a sale and had all the salient features of a loan.  For example, FIP would characterize the difference between the amount it payed for the income streams and the amount it would receive as a "discount," when, in fact, that amount was really interest that pensioners were charged on the lump-sum that he or she borrowed. Having determined that the FIP transactions were loans, the regulators determined that those loans were unlawful because (a) FIP was not a licensed lender; (b) the effective interest rates charged to the pensioners (more than 100% in some cases) violated state usury laws; and (c) the loans and were made without legally mandated disclosures. These regulatory actions also pointed out numerous questionable marketing, sales, and collection practices employed by FIP.

48.     The following is a non-exclusive list of some of the regulatory actions taken against FIP in the past few years:

- The State of Colorado determined that FIP was making loans without proper licensure. In a January 2015 assurance of discontinuance, FIP agreed not to enter into any transactions in Colorado without first obtaining a supervised lender's license and not to charge interest on their existing agreements in Colorado.

- In March 2015, the State of California issued a desist and refrain order against FIP, alleging that it engaged in the business of financial lending or brokerage without a license.  In September 2015, FIP agreed not to engage in transactions in California without obtaining a license.

- In March 2016, FIP entered into an assurance of discontinuance with the Commonwealth of Massachusetts that it would not enter into any future agreements with Massachusetts residents and that it would not charge interest on its existing contracts with Massachusetts residents.

- In June 2016, FIP entered into a settlement with the State of North Carolina whereby it agreed to reform its existing North Carolina transactions and to ensure that any future transactions with North Carolina residents would comply with the state's usury laws.

- In October 2016, FIP entered into a consent order with the State of New York, in which it agreed not to enter into any future transactions with New York residents and not to charge interest on its existing contracts with residents of New York.

- Under a December 2016 consent order with the State of Washington, FIP agreed not to enter into any transactions with Washington residents without obtaining a license and not to charge interest on its existing contracts with Washington residents.

- Under an assurance of compliance reached with the State of Iowa in December 2016, FIP agreed not to enter into any future transactions with Iowa consumers and not to charge interest on its existing contracts in Iowa.

- In February 2017, the Los Angeles City Attorney filed suit against FIP for failing to obtain a license to lend, making usurious loans, failing to disclose the terms of the loans, falsely threatening defaulting borrowers with criminal liability if they failed to make their monthly payments, and making illegal and harassing phone calls to collect on defaulted loan payments.

- In May 2017, the Commonwealth of Pennsylvania issued a cease and desist order against FIP for engaging in the business of making loans without a license and charging usurious rates of interest.

- In August 2017, the State of Minnesota filed a court action alleging that FIP's actions violated Minnesota law, and seeking to enjoin FIP from continuing in those violations; to declare all FIP loans to be void and releasing Minnesota residents from any obligations incurred under those agreements; to force FIP to make restitution to any residents harmed by its practices; and to require FIP to pay civil penalties.

- In January 2018, the State of Oregon launched an investigation of FIP's practices.

- In February 2018, the Illinois Department of Financial and Professional Regulation issued a cease and desist order, providing that FIP cease making loans to Illinois residents and stop collecting on loans previously made to Illinois residents.

- In March 2018, the Commonwealth of Virginia sued FIP, alleging that it targeted elderly veterans and retired civil servants in a scheme that masquerades high-interest predatory loans as "pension sales."

- In April 2018, the State of Illinois asked the court to void FIP's deceptive contracts and sought restitution for Illinois residents who had contracted with FIP. The State also sought to prohibit FIP from marketing or offering loan services without being licensed in the state.

- In April 2018, the State of Maryland ordered FIP to stop making new pension advances and other loans to Maryland consumers, and it also required that FIP stop collecting on any existing advances or other loans.

49.     As a result of this overwhelming regulatory pressure, FIP ultimately ceased issuing new pension advances or collecting payments from pensioners on or about April 2018. All monthly payments to members of the Plaintiff class stopped around this same time, and FIP has subsequently informed members of the Plaintiff class that they cannot expect to receive any further payments from FIP.

50.     The loss of the monthly income streams that members of the Plaintiff Class purchased from FIP has been devastating, as those monthly payments (a) represented the only way that purchasers could recoup the principal of the amounts they had set aside to execute the Life Insurance Retirement Strategy; and (b) were essential to funding their Minnesota life insurance policies and avoiding lapses, surrender charges, or other penalties.

**Minnesota and its Agents Failed to Adequately Assess the Risks of the FIP Cash Flow Product**

51.     Given that the Life Insurance Retirement Strategy could never work — and the members of the Plaintiff class would suffer substantial losses — without the FIP income streams, the members of the Plaintiff Class expected and understood that the FIP income streams would be safe and secure.

52.     As the architect of the Life Insurance Retirement Strategy, Minnesota and its Agents clearly understood this as well. It was therefore imperative that Minnesota and its Agents thoroughly investigate and understand all risks associated with the FIP funding mechanism before recommending it to clients. More importantly, Minnesota and its Agents should never have recommended the FIP funding mechanism without being completely sure that the risks of that funding mechanism would not threaten the viability of the Life Insurance Retirement Strategy in

any way.   It also should have known that the source of funds for those clients that used FIP was incorrect on the applications for insurance.

53.     Unfortunately, Minnesota and its Agents recommended the FIP funding strategy to its customers despite the substantial and troubling risks associated with FIP and the underlying pension transactions.

54.     First, the FIP cash flow product was inherently mischaracterized as a purchase and not a loan. As the effect of regulatory actions against FIP based on this make clear, that fact posed an existential risk to the entire FIP enterprise and threatened members of the Plaintiff class with devastating losses of retirement assets. Minnesota and its Agents were certainly aware of that risk, as manifested by the numerous public enforcement actions and specific disclosures in the FIP purchase agreements, but Minnesota and its Agents either failed to adequately investigate or understand those risks or disregarded those risks.

55.     Beyond this regulatory risk, there were many other substantial risks associated with the FIP funding mechanism that Minnesota and its Agents failed to adequately assess in deciding to recommend FIP cash flows as part of the Life Insurance Retirement Strategy.   These risks include:

- The fact that Scott Kohn, the sole owner and manager of FIP, is a convicted felon who has served time in a federal penitentiary for selling counterfeit computer equipment;

- The fact that FIP is a small private company operated by a few individuals and is not associated with or backed by any financial institution or other reputable entity;

- The fact that the federal government, in the 2014 GAO report, had issued a report questioning the business practices of the pension advance industry and calling for more investigations into whether that industry was violating consumer-protection laws;

- The risk that the pensioners whose income streams were purchased could stop making payments at any time, with no recourse other than hoping that income from other pensioners will cover payments;

- The risks that a pensioner would go bankrupt and the FIP contract would be treated as an unsecured debt;

- The risk that pensioners might die, and their pension beneficiaries would not make payments;

- The fact that the FIP cash flows are completely illiquid;

- The fact that U.S. federal law prohibits the assignment or alienation of federal pensions, and that those laws might be enforced to prohibit or invalidate FIP pension advance contracts with federal pensioners;

56.     Despite all of these risks, Minnesota and its Agents recommended the FIP pension income streams to members of the Plaintiff class as the best way to fund the Life Insurance Retirement Strategy. That recommendation was inappropriate and irresponsible and fell below the standard of care that Minnesota owed to members of the Plaintiff class, particularly in light of the fact that the Life Insurance Retirement Strategy could not work — and could result in devastating losses of retirement assets — if policyholders did not receive their expected cash flow payments.

57.     Sadly, the risks that should have prevented Minnesota and its Agents from recommending the FIP cash flows in the first place have now materialized and members of the Plaintiff class are left with significant losses of their retirement assets. Minnesota and its Agents should be held to account for those losses.

## CLASS ACTION ALLEGATIONS

58.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a class defined as follows: "All individuals who purchased FIP to employ as a mechanism for funding Minnesota life insurance policies and who have not already received all of the payments that they were entitled to receive under their FIP purchase agreement."

59.     This class excludes the following: Defendant, their affiliates and subsidiaries, and their officers, directors, partners, employees, and agents; class counsel, their immediate family

members and employees of their firms; counsel for Defendant, their immediate family members, and employees of their firms; and judicial officers assigned to this case and their staffs and immediate family members.

60.     Numerosity.  The members of the class are so numerous that their individual joinder is impracticable.  The exact number of class members is not known at this time, but upon information and belief, there are more than 100 individual class members. The number of persons in the class and their identities and addresses may be ascertained from Defendant's records.

61.     Existence and Predominance of Common Questions of Fact and Law.  This action involves common questions of law and fact that predominate over any questions affecting individual class members, including, without limitation:

    a.  Whether Defendant and its Agents failed to take adequate steps to assess the risks associated with the FIP funding mechanism;

    b.  Whether Defendant and its Agents failed to identify the source of funds for the class members' Minnesota policies accurately;

    c.  Whether Defendant and its Agents failed to disclose that FIP cash flows were used to fund the premiums for the class members' Minnesota policies;

    d.  Whether Defendant and its Agents undertook a contractual duty to provide members of the Plaintiff class competent retirement-planning advice;

    e.  Whether Defendant and its Agents breached its contractual duty to competently provide members of the Plaintiff class retirement-planning advice by recommending the FIP funding mechanism;

    f.  Whether Defendant and its Agents undertook a fiduciary duty to members of the Plaintiff class by providing them retirement-planning advice;

g. Whether Defendant and its Agents breached their fiduciary duty to members of the Plaintiff class by recommending the FIP funding mechanism;

h. Whether Defendant and its Agents owed members of the Plaintiff class a duty of care to provide competent and appropriate retirement-planning advice;

i. Whether Defendant and its Agents breached their duty of care to provide competent and appropriate retirement-planning advice to members of the Plaintiff class by recommending the FIP funding mechanism;

j. Whether Defendant and its Agents with supervisory responsibilities failed to supervise subordinate Agents to ensure that these duties were not breached;

k. Whether Defendant hired Agents competent to sell its products;

l. Whether Defendant trained its Agents properly to sell its products; and,

m. Whether Plaintiff and class members were harmed by Defendant and its Agents' breaches.

62. Typicality. Plaintiff's claims are typical of the other class members' claims because Plaintiff and class members were subjected to the same wrongful conduct and damaged in the same way by purchasing life insurance to be funded with the FIP cash flows.

63. Adequacy of Representation. Plaintiff is an adequate class representative. His interests do not conflict with the interests of the other class members he seeks to represent. He has retained counsel competent in investor disputes and experienced in complex class action litigation, and they intend to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately pursue and protect the interests of the class.

64. Superiority. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by

Plaintiff and the other class members are relatively small compared to the burden and expense that would be required to litigate all of these claims individually. As a result, it would be impracticable for all class members to seek redress individually. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT

65.     Plaintiffs incorporate all paragraphs by reference.

66.     Defendant and its Agents undertook contractual obligations to members of the Plaintiff Class by advising the members of the Plaintiff Class to fund purchase of Defendant's Life Insurance policies through FIP.

67.     Defendant and its Agents undertook contractual obligations to members of the Plaintiff Class to characterize and disclose all information accurately in connection with the applications for their Minnesota policies.

68.     Defendant and its Agents breached those contractual obligations by failing to conduct adequate due diligence on the FIP income stream products and nevertheless recommending those products to members of the Plaintiff class as the funding mechanism for Defendant's Life Insurance policies.

69.     Defendant and its Agents further breached those contractual obligations by failing to characterize and disclose the source of funds and the use of FIP cash flows to fund class members' Minnesota policies accurately.

70.     Based on the conduct described herein, Defendant and its Agents breached its obligations under the contracts with Plaintiffs and class members.

71.     As a direct and proximate result of Defendant and its Agents' breach of contract, members of the Plaintiff class suffered substantial financial losses.

72.     Plaintiffs and class members are entitled to recover all such damages as a result of Defendants' breach of contract.

## SECOND CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION

73.     Plaintiffs incorporate all paragraphs by reference.

74.     Defendant's Agents offered insurance and/or investment advice to members of the Plaintiff class and thus owed the members of the Plaintiff class the clear duty to exercise reasonable care, skill, diligence and prudence.

75.     Defendant's Agents breached that duty to the members of the Plaintiff class and acted with negligence by failing to conduct adequate due diligence on the FIP cash flow product, and recommending that product to the members of the Plaintiff class.

76.      Defendant's Agents breached that duty to the members of the Plaintiff class and acted with negligence by failing to conduct adequate due diligence on the FIP cash flow product, and by allowing that product to serve as a funding mechanism for the premium payments of the Minnesota policies to the members of the Plaintiff class as described herein.

77.     Defendant and its Agents further breached that duty by failing to characterize and disclose the source of funds and the use of FIP cash flows to fund class members' Minnesota policies accurately.

78.     Defendant's Agents acts and omissions constitute gross negligence because they constitute an extreme departure from what a reasonably careful person would do in the same situation to prevent loss of retirement income.

79.     As a direct and proximate result of Defendant's Agents negligence, Plaintiffs and class members suffered substantial financial losses which are now Defendant's responsibility. Plaintiff and the Plaintiff class are entitled to actual and punitive damages.

### THIRD CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY

80.     Plaintiffs incorporate all paragraphs by reference.

81.     Defendant's Agents held themselves out as experienced retirement and/or insurance planners and provided retirement planning and/or insurance planning advice to the members of the Plaintiff class.

82.     The members of the Plaintiff class placed their trust and confidence in Defendant's Agents, which Defendant and its Agents accepted by providing specific advice as to how the members of the Plaintiff class should invest their assets for retirement and/or purchase insurance products for retirement purposes.

83.     As such, Defendant and its Agents undertook a fiduciary duty to the members of the Plaintiff class to act fairly and honestly, in good faith, and in the sole best interest of the members of the Plaintiff class.

84.     Defendant and its Agents breached their fiduciary duty to the members of the Plaintiff class by failing to conduct adequate due diligence on the FIP cash flow product and recommending and/or utilizing that product as a component of the retirement strategy recommended to the members of the Plaintiff class to fund Defendant's life insurance policies.

85.     Defendant and its Agents further breached that duty by failing to to accurately characterize and disclose the source of funds and the use of FIP cash flows to fund class members' Minnesota policies.

86.     As a direct and proximate result of Defendant and its Agents' breach of fiduciary duty, Plaintiffs and class members suffered substantial financial losses. Plaintiff and the Plaintiff class are entitled to recover actual and punitive damages.

### FOURTH CAUSE OF ACTION – DECLARATORY JUDGMENT

87.     Plaintiffs incorporate all paragraphs by reference.

88.     This is an action for declaratory relief pursuant to 28 USC §2201 et. seq. and Federal Rules of Civil Procedure Rule 57.

89.     An actual justiciable controversy between Defendant and Plaintiff exists within the meaning of 28 U.S.C. § 2201 regarding whether Defendant's Life Insurance Policy is valid and whether Plaintiff must continue to fund Defendant's Life Insurance Policy.

90.     Plaintiff asks this Court to declare:

    a.  Defendant's Life Insurance Policy funded through FIP is void and not valid;

    b.  Plaintiff has no duty to continue to fund the policy;

    c.  Plaintiff is entitled to rescission of the policy and the return of his premium payments.

91.     The object of this declaratory judgment is to permit determination of a controversy before obligations are repudiated or rights are violated.  .

### FIFTH CAUSE OF ACTION – NEGLIGENT HIRING TRAINING AND SUPERVISION

92.      Plaintiffs incorporate all paragrahs by reference.

93.     Minnesota hired its agents to sell its insurance products.

94.     Minnesota's Agents acted negligently, grossly negligently, and incompetently in the recommendation and/or utilization of FIP as a funding mechanism for Minnesota's policies.

95.     Minnesota knew or should have known of its Agents' use of the FIP product in the sale of Minnesota life insurance policies and the risks associated with that strategy.

96.     If Defendant had properly hired, trained or supervised its Agents, Plaintiff and the Plaintiff class would not be left with the prospect of losing their savings, having an underfunded life insurance policy, or liquidating assets to continue to fund any such Minnesota policy.

97.     As a direct and proximate result of Defendant's failure to properly hire, train and supervise its Agents, its Agents have caused direct and proximate harm to Plaintiff and the Class.

98.     Plaintiff and the Class members are entitled to actual and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Plaintiff Class request that the Court enter an Order or judgment against Defendants as follows:

A.  Certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

B.  Awarding Plaintiff and other Class members damages and all other relief available under the claims alleged including punitive damages;

C.  Declaring Defendant's Life Insurance Policy is void and not valid and that Plaintiff is entitled to refund of his premiums;

D.  Awarding Plaintiff and other Class members pre-judgment and post judgment interest as a result of the wrongs complained of herein;

E.  Awarding Plaintiff and other Class members their costs and expenses in this litigation, including reasonable attorneys' fees and other costs of litigation; and,

F.   Awarding such other relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


September 25, 2018                          Respectfully submitted,

                                           */s/  James P. Booker*
                                           James P. Booker (OBN 90803)
                                           Lydia M. Floyd (OBN 88476)
                                           **Peiffer Wolf Carr & Kane**
                                           **A Professional Law Corporation**
                                           1422 Euclid Avenue, Suite 1610
                                           Cleveland, Ohio 44115
                                           Phone: (216) 589-9280
                                           Fax:    (216) 916-9220
                                           Email: jbooker@pwcklegal.com
                                           Email: lfloyd@pwcklegal.com

                                           Joseph C. Peiffer (*pro hac vice to be filed*)
                                           **Peiffer Wolf Carr & Kane**
                                           **A Professional Law Corporation**
                                           201 St. Charles Avenue, Suite 4610
                                           New Orleans, LA 70170
                                           Phone: (504) 523-2434
                                           Fax:    (504) 523-2464
                                           Email: jpeiffer@pwcklegal.com

                                           Robert G. Rikard (*pro hace vice to be filed*)
                                           Peter D. Protopapas (*pro hace vice to be filed*)
                                           **Rikard & Protopapas, LLC**
                                           1329 Blanding Street
                                           Columbia, SC 29201
                                           Post Office Box 5640 (29250)
                                           Phone: (803) 978-6111
                                           Fax:    (803) 978-6112
                                           Email: rgr@rplegalgroup.com
                                           Email: pdp@rplegalgroup.com

                                           Attorneys for Plaintiff and the Proposed Class

23